**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 1, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

THOMAS JAMES ZAJAC,

Defendant-Appellant.

Nos. 10-4176 and 11-4080
(D.C. No. 2:06-CR-00811-CW-1)
D. of Utah

**ORDER AND JUDGMENT**[*]

Before **O'BRIEN**, **TYMKOVICH**, and **MATHESON**, Circuit Judges.[**]

Thomas Zajac raises two issues in this consolidated appeal of convictions

stemming from an incident where he detonated an improvised explosive device

(IED) at the Salt Lake City Library in 2006. Zajac did not go to trial until 2010,

and he argues the multi-year delay between his indictment and trial violated the

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

[**] After examining the briefs and the appellate record, this three-judge
panel has determined unanimously that oral argument would not be of material
assistance in the determination of this appeal. *See* Fed. R. App. P. 34(a); 10th
Cir. R. 34.1(G). The cause is therefore ordered submitted without oral argument.

Sixth Amendment and the Speedy Trial Act.  Having jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM his convictions for the reasons discussed below.

# I. Background

On September 15, 2006, Zajac detonated an IED inside the Main Library in Salt Lake City, Utah.  No one was injured or killed by the blast, but it caused several thousand dollars of property damage.  Zajac then sent an anonymous letter to the Salt Lake City Police informing them he set off the IED as a warning because they had "strong-armed a helpless person."  R. Vol. I at 107.  This was later revealed to be a reference to Zajac's son, who had recently been charged with a DUI.  Zajac told the police that if they continued to "bully" people, his next bomb would "be designed to kill."  *Id.*

Police arrested Zajac after they found his fingerprints on a piece of the IED.  He was charged in a six-count indictment with violating numerous federal laws.[1]  The court appointed counsel to represent Zajac at his initial appearance on November 17, 2006.  A jury trial was set for January 29, 2007.

---

[1] Zajac was charged with damaging a building with an explosive device in violation of 18 U.S.C. § 844(i), using or carrying a destructive device in relation to a crime of violence in violation of 18 U.S.C. § 924(c), possessing an unregistered destructive device in violation of 26 U.S.C. § 5861, possessing a destructive device following a domestic violence conviction in violation of 18 U.S.C. § 922(g)(9), willfully using the mail to threaten the use of explosives in violation of 18 U.S.C. § 844(e), and transporting explosives in interstate commerce with the intent to damage a building in violation of 18 U.S.C. § 844(d).  A superseding indictment later added a charge of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

2

Zajac's trial was not held on January 29, 2007. In fact, he did not go to trial until September 20, 2010, more than three and a half years later. The following describes the many detours the case took on the way to trial.

The first detour occurred two weeks after Zajac's first attorney was appointed, when that attorney moved to withdraw. He informed the court Zajac was uncooperative, had breached a personal agreement, and had held a press conference without the attorney's knowledge. Zajac agreed his attorney should withdraw. The court granted the motion, appointed new counsel, and reset Zajac's trial for February 12, 2007.

This was but the first in a series of conflicts Zajac had with his numerous attorneys. Over the next nine months, Zajac changed counsel five times. After each substitution, the court reset Zajac's trial date to give his new attorney time to prepare. The reasons Zajac's fifth attorney, a federal public defender, gave for his withdrawal illustrate the general difficulties Zajac's attorneys faced. His fifth attorney learned from jailhouse telephone transcripts he received during discovery that Zajac continued to seek alternate counsel and made disparaging comments about the Federal Defender's Office, stating he had no intention of allowing a public defender to represent him at trial and would seek to retain a new attorney just before his trial.

On August 28, 2007, the court permitted Zajac's fifth attorney to withdraw. It also found the Federal Defender's Office could not continue to represent Zajac.

The court then appointed a sixth attorney to represent Zajac. The court also warned Zajac that if he could not get along with his new counsel, he might have to represent himself. Zajac worked with his sixth attorney until trial, though he continued to express to the court his desire for new counsel.

Despite all this, Zajac's attorneys filed numerous dismissal and discovery motions. Although the court ruled on most of these motions in a timely fashion, it did not rule on some of the motions until just prior to trial. Zajac's sixth attorney filed or renewed several motions after her appointment, including two motions to dismiss and three motions to exclude expert testimony. The court held hearings on these motions in March and April of 2008, and denied them on April 21, 2008.

Even after Zajac stopped seeking new counsel, he continued filing motions that delayed the start of his trial.[2] In May 2008, Zajac's attorney moved for a psychological evaluation of her client to determine his competency to stand trial. The court granted this motion, and the evaluation occurred in July and October of 2008.[3] After the evaluation was complete, Zajac stipulated to his competency in February 2009.

---

[2] When making these motions, Zajac's counsel repeatedly responded to the trial court's concerns about delay by assuring the court that Zajac's motions tolled the speedy trial clock.

[3] Zajac's case was also reassigned to a new district court judge in October 2008.

In January 2009, Zajac moved to compel DNA testing.[4] The parties briefed the motion, and the court held a hearing on the issue. The court granted the motion in April 2009. Zajac then informed the court in June 2009 the DNA testing process would take about four months. In November 2009, Zajac informed the court the testing was complete.

Also in November 2009, Zajac informed the court he was ready to proceed with a *Daubert* hearing on his motions to exclude expert testimony. This required a total of three hearings and five days of testimony between March and September of 2010. The court issued four separate orders regarding these motions.

Zajac's trial finally began on September 20, 2010 but ended the next day after the court granted a defense motion for a mistrial. Zajac's second trial began on September 22, 2010. He was found guilty and sentenced to 420 months' imprisonment. Zajac's sixth attorney withdrew after the trial. His seventh attorney was appointed by the court soon after and represented Zajac in moving for a new trial and at sentencing. His seventh attorney then withdrew. We appointed an eighth and final attorney to represent Zajac on appeal, and have denied Zajac's requests for yet another change of counsel.

---

[4] Zajac contended if fingerprints were found on the IED's fragments, DNA might be present as well. Zajac generally argued the quality of the government's fingerprint evidence was poor and any DNA evidence was likely to be exculpatory.

5

During this saga, Zajac told the court he was concerned with how long it was taking his case to proceed to trial and requested the court move the case to trial. And, as early as June 12, 2007, Zajac's fifth attorney conveyed this concern to the court. The prosecution agreed, but pointed out all delays at that point were due to Zajac's own actions, which his attorney acknowledged.

In June 2008, Zajac wrote a letter to the court expressing his concern his case was taking too long to go to trial, worrying witnesses and other evidence might be rendered unavailable by the delay, and asking the court to hold a status conference. The court informed Zajac it would issue a scheduling order rather than hold a status conference, as this was the fastest way to move the case to trial. The court also requested that Zajac communicate through counsel. Finally, in October 2009, Zajac again complained to the court he had been awaiting trial for over three years.

## II. Discussion

Zajac argues on appeal that the long delay between his indictment and conviction violated both his constitutional right to a speedy trial under the Sixth Amendment and his statutory right to a speedy trial under the Speedy Trial Act, 18 U.S.C. § 3161. We address each of his contentions in turn.

### A. Sixth Amendment

Ordinarily, this court reviews a defendant's claim that his Sixth Amendment speedy trial right was violated de novo. *United States v. Larson*, 627

6

F.3d 1198, 1207 (10th Cir. 2010). The government asserts we should review this claim for plain error because Zajac did not raise this objection before the district court. *See United States v. Gomez*, 67 F.3d 1515, 1521 (10th Cir. 1995). Zajac argues the de novo standard should apply, but he provides no record citations to a constitutional objection. Our independent review of the record reveals Zajac complained to the district court about the delay in his case, but we find nothing to suggest Zajac ever argued to the district court his Sixth Amendment speedy trial right was being violated. In any event, we need not resolve whether Zajac's complaints were sufficient to preserve this issue for appeal because Zajac's claim fails even if we review it de novo.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. "To determine whether a defendant's Sixth Amendment right has been violated, the court balances four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his speedy trial right; and (4) whether the delay prejudiced the defendant." *Larson*, 627 F.3d at 1207 (internal citation omitted). "None of the factors is itself necessary or sufficient to conclude that the Sixth Amendment speedy trial right has been violated." *Id.*

1. Length of Delay

Both parties agree the time between indictment and trial was "presumptively prejudicial" for the purposes of triggering a Sixth Amendment

7

analysis because it was longer than one year. *See Doggett v. United States*, 505 U.S. 647, 651–62 (1992). The delay in this case was nearly four years. "The longer the delay, the more likely it is that the first factor will weigh in the defendant's favor." *Larson*, 627 F.3d at 1208.

But the length of the delay is not the only consideration in our analysis of this factor. Even a lengthy delay may not be unreasonable if the charges are complex. *United States v. Seltzer*, 595 F.3d 1170, 1176 (10th Cir. 2010) (citing *Barker v. Wingo*, 407 U.S. 514, 531 (1972)).

The government argues the delay here was not unreasonable because the charges against Zajac were serious and complex, requiring expert analysis and DNA testing. It also points out that Zajac's trial ultimately lasted nine days. Zajac makes no response, other than to note other cases where we have found similarly long delays to be presumptively prejudicial. *See United States v. Yehling*, 456 F.3d 1236, 1244 (10th Cir. 2006) (finding delay of three years and eight months presumptively prejudicial).

The charges against Zajac were serious and the evidence highly technical, but we are not convinced this renders the nearly four-year delay reasonable. The government also argues the vast majority of the delay in this case was caused by Zajac. This tends to undercut its argument that the lengthy period between indictment and trial was necessary in light of the complexity of the charges and evidence.

8

While not entirely one-sided, this factor weighs in Zajac's favor.

2.  Reason for the Delay

This second factor "weighs against the government in proportion to the degree to which the government caused the delay," *United States v. Batie*, 433 F.3d 1287, 1291 (10th Cir. 2006), and is "the flag all litigants seek to capture." *Seltzer*, 595 F.3d at 1177 (internal quotation omitted).  The government bears the burden of providing an acceptable rationale for the delay.  *Jackson v. Ray*, 390 F.3d 1254, 1261 (10th Cir. 2004).  It easily meets that burden here.

First, Zajac admits the second factor "does not point inevitably to the propriety of dismissal."  Aplt. Br. at 19.  He acknowledges the "case is very complicated, and the appellant's changes of counsel did not help matters."  *Id.* at 19–20.  He relies heavily on the fact that the case was transferred to a new judge, which required the new judge to familiarize himself with the case.  This may have delayed the proceedings somewhat, but it was not the fault of either party.

Zajac also points to the two superseding indictments in the case, arguing these further delayed the proceedings and this delay should be attributed to the government because the prosecution bears the burden of bringing the case promptly to trial.  *Seltzer*, 595 F.3d at 1175–76.  This argument is also not convincing.  Zajac's first superseding indictment was largely ministerial and not substantive; it was issued two weeks after his first indictment and added no new charges.  His second superseding indictment was issued on March 10, 2010.  It

9

added one new charge, possession of a firearm (the IED) by a convicted felon. Zajac did not seek a continuance based on this indictment, nor does it appear to have caused any delay in moving his case to trial. Zajac's trial occurred six months after the second indictment issued, and most of the intervening period was occupied by hearings on his *Daubert* motions and other unrelated matters. At most, this indictment accounted for an insignificant portion of the overall delay.

Second, the government persuasively argues the vast majority of the delay in this case was caused by Zajac. During the first nine months after his indictment (November 2006 to August 2007), Zajac changed counsel five times. From August 2007 to April 2008, the court held two hearings and ruled on a number of motions Zajac filed. Zajac then filed a motion for a psychological evaluation to determine his competency; the motion and resulting evaluation consumed the period between May 2008 and February 2009, after which Zajac stipulated to his competency.

Zajac then sought DNA testing, a process that consisted of a contested hearing and then a period of testing that lasted from February 2009 until November 2009. Finally, the court dealt with a number of unresolved motions filed by Zajac, resolution of which required three hearings and resulted in four separate written decisions between March 2010 and September 2010. Trial began on September 20, 2010.

10

This demonstrates that most of the delay in this case was caused by Zajac, not the government. During this entire time, the government did not seek a single continuance of Zajac's trial.[5] Although Zajac is correct the government bears the ultimate responsibility for bringing his case to trial, he cannot complain about the delay he caused. *United States v. Askew*, 584 F.2d 960, 962 (10th Cir. 1978).

Because Zajac caused almost all the delay in his case, this factor weighs heavily against him.

### 3. Zajac's Assertion of His Right

We next look to whether Zajac asserted his right to a speedy trial. "[T]he defendant's assertion of the speedy trial right is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *United States v. Dirden*, 38 F.3d 1131, 1138 (10th Cir. 1994) (internal quotation omitted).

Zajac argues he was pushing to go to trial continuously and stood ready to do so much more quickly than what actually occurred. The record tends to support his position that he was, at least outwardly, asserting his right to a speedy trial. Zajac wrote to the court in June 2008 and October 2009 complaining about the delay and asking for a timely decision on his outstanding motions. He complained the delay was causing disruption to his family and his business

---

[5] The government did move for continuance of a *Daubert* hearing, but the court denied this motion.

11

relationships. Additionally, one of Zajac's attorneys informed the court Zajac had been incarcerated for 42 months by July 2010 and was anxious to have the trial begin.

The government asserts Zajac waited over eighteen months to initially assert his right to a speedy trial and argues this fact should be weighed against him. *See United States v. Toombs*, 574 F.3d 1262, 1274 (10th Cir. 2009) (finding waiting seventeen months to assert a speedy trial right cuts against the defendant). We are not sure Zajac actually waited this long, as it appears his fifth attorney conveyed Zajac's concerns about delay to the court in June 2007, less than a year after his original indictment.

Although Zajac's requests were informal and sporadic, we conclude this factor weighs in Zajac's favor, but only slightly. Zajac's assertions "must be viewed in the light of [the defendant's] other conduct." *United States v. Loud Hawk*, 474 U.S. 302, 314 (1986). Ultimately almost all of the delays in this case were occasioned by the choices made by Zajac or his counsel—conduct at odds with a strong preference for trial.

The most telling piece of evidence undercutting Zajac's outward assertions of his speedy trial right is the recording of Zajac's phone conversation from jail his fifth attorney brought to the court's attention in 2007. It appears to encapsulate Zajac's mindset during the pre-trial period. As discussed previously, this conversation revealed Zajac had no intention of being represented by a public

12

defender at trial and planned to retain a new attorney just prior to trial. After allowing Zajac to switch counsel again, the court admonished him that "this is going to be the last time. If you cannot get along with your new lawyer . . . you may end up representing yourself. And I am just putting you on notice . . . because this has been languishing and it has been going on for quite a period of time. This is clearly occasioned by you." Supp. R. Vol. III at 60. This is but one example of the court admonishing Zajac the case needed to continue moving forward. Almost all of the delays in the case at this point were attributable to Zajac in some form or another.

In sum, while Zajac periodically asserted his rights, the fact the delay was occasioned by his actions and his tactics cuts against him. Even though this prong weighs in favor of relief for Zajac, it does not do so heavily because the delay was ultimately a product of his own making.

### 4. Prejudice

As for the final factor, the right to a speedy trial is designed "to prevent oppressive pretrial incarceration, to minimize anxiety and concern of the accused, and to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. Of these, the last is the most serious. *Id*. When analyzing this factor, we consider that the ability to remember details decreases with time, and that "time spent in jail awaiting trial has a detrimental impact on the individual . . . often

13

mean[ing] loss of a job, [a disruption in] family life; and it enforces idleness." *Id.* at 532–33.

Zajac argues the long delay between his indictment and trial makes the loss of details likely, and argues his incarceration throughout the pretrial period negatively affected his ability to collect evidence and otherwise prepare his defense. But "generalized and conclusory references to the anxiety and distress . . . [of] incarceration are not sufficient to demonstrate particularized prejudice." *Larson*, 627 F.3d at 1210–11. Zajac points to nothing material that was compromised by the pretrial delays.

As the government notes, Zajac has identified "no witness who would have been available but for the delay," nor does he claim specific "witnesses' memories have faded as a result of the delay." *Dirden*, 38 F.3d at 1138. Even if, as Zajac asserts, "what has been forgotten can rarely be shown," Aplt. Br. at 19, "[t]his is not a situation where, for example, as a result of the delay, the defense no longer had access to certain evidence or could no longer use a witness because that witness died before trial." *Toombs*, 574 F.3d at 1275. And while it is true Zajac's personal life was disrupted as a result of his incarceration, "he has not alleged any special harm suffered which distinguishes his case from that of any other arrestee awaiting trial." *Dirden*, 38 F.3d at 1138.

Thus we conclude this factor does not weigh in his favor.

14

5. Balancing

Based on this record, the district court did not err in concluding the balance of these factors demonstrated no Sixth Amendment violation. Although the first and third factors weigh lightly in Zajac's favor, the second factor weighs heavily against him and the fourth factor also does not help him at all. In short, nothing in the record indicates the substantial majority of the delay in this case was anyone's fault other than Zajac's. While it is true the court did not rule on certain motions for long periods of time, there was other action taking place continuously in the case, and Zajac has not shown that, but for these motions, the trial would have commenced years earlier because that is simply not the case. Thus we find Zajac's constitutional right to a speedy trial was not violated.

## B. *Speedy Trial Act*

Zajac also claims the long delay between his conviction and sentencing violated the Speedy Trial Act. The Speedy Trial Act requires the trial of a criminal defendant to commence within seventy days of the filing of the indictment, or from the date the defendant first appears before a judicial officer. 18 U.S.C. § 3161(c)(1). But the statute is not self-executing; the defendant bears the burden of asserting a violation of the statute. "Failure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal. . . ." *Id.* at § 3162(a)(2).

15

Zajac does not dispute that he failed to assert his rights under the Speedy Trial Act before the district court. He attempts to cure this failure by arguing "a novel issue not raised in the district court may be considered on appeal if 'manifest injustice' would result from its being disregarded by the reviewing court." Aplt. Br. at 21 (citing *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1115 (3d Cir. 1993)).

We do not find Zajac's citation to *Pritzker* persuasive because the issue he raises is not novel; our decision in *United States v. Gomez*, 67 F.3d 1515 (10th Cir. 1995), is directly on point and precludes consideration of Zajac's claim. *Gomez* involved a Speedy Trial Act claim where the appellant failed to raise the issue at trial. *Id*. *Gomez* held it could not review the appellant's claim even for plain error because there was no error to review. *Id*. at 1520.

Quoting the Supreme Court's statement that "[d]eviation from a legal rule is 'error' unless the rule has been waived," *United States v. Olano*, 507 U.S. 725, 732–33 (1993), the *Gomez* court reasoned if a defendant made a valid waiver, there was no error to correct. *Id*. *Gomez* noted that while failure to assert a constitutional right does not waive that right, the scope of a statutory right is defined by the statute creating the right. *Id*. Depending on its scope, a statutory right may be validly if unknowingly waived. *Id*. (internal citation omitted). Because the Speedy Trial Act "unequivocally provides that the failure of a defendant to move for dismissal prior to trial constitutes a waiver of any right to

16

that remedy," *Gomez* concluded a failure to assert that right rendered any potential violation of the act unreviewable on appeal.[6] *Id.*

By the clear terms of the Speedy Trial Act, Zajac waived his right to this remedy by failing to assert it before the district court. Consequently, this court cannot review Zajac's Speedy Trial Act claim, even for plain error. *Id.*

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

Entered for the Court,

Timothy M. Tymkovich
Circuit Judge

---

[6] This result may appear to conflict with our cases discussing the distinction between waiver and forfeiture. *E.g., United States v. Carrasco-Salazar*, 494 F.3d 1270 (2007). Under normal circumstances, a right is not waived unless the waiver is intentional, such as when a party raises and then abandons an argument or invites an error. *Id.* at 1272. A party who merely neglects to assert a right is said to have forfeited it. *Id.* A forfeited right may be reviewed for plain error, but a waived right may not. *Id.*

This seems to suggest that Speedy Trial Act claims not raised below can be reviewed for plain error. But this would ignore the text of the act, which states, "[f]ailure of the defendant to move for dismissal prior to trial . . . *shall constitute a waiver* of the right to dismissal." 18 U.S.C. § 3162(a)(2) (emphasis added). In effect, this transforms what under normal circumstances would be mere forfeiture into waiver. Our sister circuits concur with this interpretation: "every circuit to consider the issue has held that the failure to move for dismissal under the [Speedy Trial] act constitutes a waiver, not merely a forfeiture." *United States v. Gearhart*, 576 F.3d 459, 462 (7th Cir. 2009) (citation omitted).